(No. 37770.—<span style="background:black">              </span>

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE SMITH, Plaintiff in Error.

*Opinion filed September 27, 1963.*

JULIUS L. SHERWIN and THEODORE R. SHERWIN, both of Chicago, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and EDWARD J. HLADIS and MARVIN E. ASPEN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE HOUSE delivered the opinion of the court:

In a bench trial in the criminal court of Cook County George Smith was found guilty of the crime of receiving stolen property and was sentenced to the penitentiary for a term of one to two years. A writ of error has been issued to review his conviction.

It is argued that the People failed to prove that the property involved was stolen property but proved that the property was found by the co-defendant William Thomas, against whom the indictment was nolle prossed; that the People failed to prove that the property allegedly received was the same as that allegedly stolen; and that they failed to prove the fair cash market value of the property at the time and place-of the alleged larceny or receiving. In the view we take of the record, which practically shows defendant's innocence, consideration of these contentions is unnecessary.

Harold Shaer, a Canadian coin dealer, left Montreal, Canada, on November 1, 1961, for a convention in Los Angeles. He flew on Trans-Canada Air Lines from Montreal to Chicago where he changed flights at O'Hare Field in Chicago and flew on Trans-World Air Lines to Los Angeles. When he left Montreal he had a considerable stock of rare coins which he intended to display. He had the coins in a piece of tan luggage which was put aboard the plane at Montreal and checked through to Los Angeles. He did not see this luggage again until he arrived in Los Angeles, when upon arrival at his hotel he noticed that a set of Canadian gold coins in a black plastic holder was missing from his luggage.

Shaer testified that he did not remember the exact time the flight left Chicago but said it was daytime. He stated the face value of the missing coins was $45 in gold, but since the coins were not currently in circulation, their value on November 1, 1961, would be about $600. He also stated that the plastic case in which he kept the coins was one of

six that he had had specially designed for himself. Coins of the same year of issuance and denomination as the missing coins and a plastic case identical to the missing plastic case were admitted into evidence.

William Thomas testified that on November 1, 1961, he was employed by Trans-World Airlines and worked at O'Hare Field as a cargo agent. His duties involved the loading and unloading of luggage and freight from the airplanes. Luggage to be loaded on a flight is received at the baggage counter, placed on a conveyor which sends it down a chute to the baggage room a floor below the baggage counter. About 10:00 or 10:30 P.M. on November 1, Thomas was working in the baggage room collecting the luggage as it came down the chute and sorting it according to flight numbers tagged on the bags which he then placed on baggage carts. While performing these duties he noticed a piece of luggage coming down the chute in an upright position and open about 8 to 10 inches. He closed the bag and loaded it on a baggage cart. About 1 to 1½ hours later he found a black plastic container lying under the conveyor. The container had six gold coins in it and looked like the container and coins introduced in evidence. He put the plastic container in his pocket and continued working. He did not take the container of coins to the "lost and found" but took them home that evening.

He further testified that in addition to working for Trans-World Airlines he was working for the Acme Letter Company located near the Loop in Chicago. On November 6, 1961, he went downtown about two hours before he was due at work at the letter company. He went to an unnamed coin shop near Dearborn and Washington in the Loop. He was in that coin shop about 5 to 10 minutes and then went to the Chicago Coin Exchange at 108 North Dearborn. He asked Jane Redfern, the woman working there, if she wanted to buy the coins. The woman told Thomas he would have to wait until her husband returned. While he was

waiting, defendant, a Chicago police officer who had been directed there by Thomas Ryan, came into the store and asked the saleslady what the trouble was. She answered that there was no trouble. He talked to her awhile and then asked Thomas what he was doing. Thomas told the officer it was none of his business. Mrs. Redfern then told the officer that Thomas was trying to sell some gold coins. The officer looked at the coins, asked Thomas where he got them, and Thomas said he found them. The officer asked where he was working. A call was made to the Acme Letter Company and the officer confirmed Thomas's statement that he worked there and was to report for work later that afternoon. The officer also demanded that Thomas identify himself, which he did. Thomas stated the officer then took the coins and told him he would have to check to see if they had been stolen, that if they had not been stolen that he would return them to Thomas the next evening at Washington and Dearborn. Thomas said he was in this second coin store for about 1½ to 2 hours.

After he got home from work later that night he learned from his wife that two police officers had come to the house looking for some gold coins and asked her if she had seen any. She told them no. The next day Thomas worked at TWA and he testified that that afternoon he returned to the corner of Dearborn and Washington and again the following afternoon, but he did not see defendant on either occasion. On November 8, while he was working at the Acme Letter Company two detectives arrested him. He told the detectives that he had handed the coins to the defendant and that he had not since seen them.

Jane Redfern testified that she was working in the store on November 6, 1961, when Thomas came in and tried to sell some coins which she said looked like the coins introduced in evidence. She said in her opinion the coins were worth between five and six hundred dollars. Thomas· had been in the store about 15 minutes and was looking at some

other coins when defendant entered the store and asked her what the trouble was. She told him there was no trouble. She and defendant then had a general conversation for about 15 minutes when Thomas said that he could not wait for her husband any longer. She then gave Thomas the coins and defendant asked Thomas where he got the coins and he said in a poker game. She also verified the telephone call to the Acme Letter Company. She said defendant took the coins from Thomas and they both walked out of the store.

She testified that about 15 minutes after the two men left, she noticed defendant walking away from a squad car which was parked across the street. She motioned to him and he came back into the store. She asked if the coins were stolen because she wanted to buy them if they were not stolen. She said defendant told her that he let Thomas go because he seemed to be all right, but that he kept the coins so that he could check at the station and see if they had been stolen; that if they had not been stolen he would return them to Thomas the next evening; and that he would suggest that Thomas sell them to her. On her way home that evening she stopped at the Acme Letter Company to see Thomas but denied that she bought any coins from him.

William Havansek testified that he is a police officer and that he and officer O'Riordan were in a squad car on November 6, 1961, when they received a call about 5:00 P.M. from central complaint room to go to the Leonard Stark Coin Mart at 25 North Dearborn. Upon arrival they found the store closed and notified central complaint room. They were told to make the case "unfounded." The officers started to drive north, when a man at the intersection of Washington and Dearborn "flagged" them. They stopped across the street from the Chicago Coin Exchange. The man entered the squad car and identified himself as Leonard Stark. Defendant, who was directing traffic at the inter-

section, walked to the squad car and also got in it. Stark said that an unknown man entered his store with a plastic box of gold coins. When Stark asked the man what he wanted for them, he said $45 which was face value. Stark said he would have bought them, but he knew the coins were worth $400 and therefore, called the police and in the meantime the man left. Havansek testified on cross-examination that defendant said he had checked the man out and gave the officers in the squad car Thomas's name, address and place of employment.

The defendant testified that on November 6 he was a Chicago police officer and was directing traffic at the intersection of Washington and Dearborn. While he was directing traffic that afternoon, an unknown man came to the center of the intersection and told him they wanted him in the coin shop. He went to Thomas Ryan's coin shop at 108 North Dearborn. Ryan directed defendant to the Chicago Coin Exchange. Defendant's testimony indicates that Thomas had been at Ryan's and went from there to the Coin Exchange. When he went into the Coin Exchange he asked Jane Redfern if there was any trouble. She looked startled and said no. She asked why he had come there and he said he was told she was having trouble. He asked if Thomas was causing trouble and she said no. After he had talked with her for a while, he approached Thomas and asked him his name. Thomas became belligerent. After some sarcastic remarks he did tell the officer his name. Defendant said that Thomas told him he won the coins in a poker game. Because Mrs. Redfern made no complaint and because Thomas's identification papers and the telephone call to his place of employment indicated he was telling the truth, the defendant said he permitted Thomas to go on his way. He denied that he took the coins from Thomas or that he told Thomas to return to the intersection the next evening.

He said he returned to the intersection to direct traffic

and about 5:00 or 5:15 P.M. the squad car pulled up at the corner of the intersection. He said that he went over to the car and got into it with Stark and two officers. He told the officers that the information furnished by Thomas checked out and he let him go. He said he returned to the intersection and about 15 minutes later Jane Redfern and a man she identified as her husband came to him and said they would make it worth his while if he gave them Thomas's address. Defendant denied that he returned to the Chicago Coin Exchange after he left the squad car and denied the conversation Jane Redfern attributed to him at that time. He denied that he ever took or received the coins from Thomas.

After defendant went off duty on November 6, he and a man (not a police officer) who knew the neighborhood where Thomas lived, went to Thomas's home. Defendant identified himself as a police officer to Thomas's wife and she said Thomas was not home. He asked her if Thomas had any gold coins and she said no. He said this was all the conversation he had with her.

Thomas Ryan and Leonard Stark, the proprietors of the other two coin shops in the vicinity of Washington and Dearborn were not called to testify.

There is, first of all, a conflict in the testimony which leaves some doubt as to how Thomas came into possession of the coins. Shaer testified that his flight for Los Angeles left Chicago in the daytime. According to Thomas the open bag came down the chute between 10:00 and 10:30 P.M. And while Thomas testified he found the coins under the chute, both Jane Redfern and defendant testified that Thomas told defendant at the coin shop that he won the coins in a poker game.

It is undisputed that defendant went to Thomas's home after he was off duty on November 6 and asked about the gold coins. This conduct is consistent with his testimony that Jane Redfern said she would make it worth his while

if he would give her Thomas's address and is entirely inconsistent with the testimony that he had taken and kept the coins earlier that afternoon.

The evidence, however, which not only creates a reasonable doubt of defendant's having received the coins but which almost shows his innocence is that which indicates that Thomas left Redfern's shop with the coins and tried to sell them to Stark. The record shows that there are three coin shops in the vicinity of Washington and Dearborn—one owned by the Redferns, one owned by Ryan, and one owned by Stark. According to Thomas's testimony he arrived in the Loop two hours before he was to report at work, which was 5:00 P.M. In other words, he arrived in the vicinity about 3:00 P.M. He testified that he went to a coin shop where he stayed about 5 or 10 minutes and then went to the Redfern's Chicago Coin Exchange where he stayed for 1½ to 2 hours, which would mean that he left there between 4:30 and 5:00 P.M. The evidence indicates that it was Ryan's shop that Thomas visited before going to the Redfern's. The testimony of officer Havansek shows that he and his fellow officers received a call about 5:00 P.M. to go to Stark's coin shop; that they proceeded immediately to the shop and found it closed; and that within a few minutes they arrived at the intersection where Stark told them that the coins had been offered to him for $45 and he called central complaint room while the man who had the coins was still in the store. Although there is no direct testimony as to the time Stark telephoned for the police, all the circumstances tend to show that the call was made shortly before 5:00 P.M. This means Thomas was at Stark's shop after he left Redfern's shop and it was impossible for defendant to have taken the coins from Thomas at Redfern's shop and thereafter kept them as Thomas testified.

It is unfortunate that Ryan and Stark were not called to testify in order that this reasonable doubt of defendant's guilt could be removed or his innocence established. Based

on the record before us we can only reverse the conviction. The judgment of the criminal court of Cook County is accordingly reversed.

*Judgment reversed.*